## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

| | |
|---|---|
| **United States Of America,** | |
| **Plaintiff,** | |
| **v.** | **Case No. __** |
| **Real Property Located at 585 SE 971st Road, Clinton, Missouri 64735, along with all its Buildings, Appurtenances, and Improvements,** | |
| **Defendant.** | |

### COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, United States of America, by its attorneys, Timothy A. Garrison, United States Attorney for the Western District of Missouri and Stacey Perkins Rock, Assistant United States Attorney, brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

### NATURE OF THE ACTION

1.      This is an action to forfeit property to the United States for violations of 18 U.S.C. § 981(a)(1)(A) and 18 U.S.C. § 981(a)(1)(C).

### THE DEFENDANT *IN REM*

2.      The defendant real property known and numbered as 585 SE 971st Road, Clinton, Missouri 64735, with all its appurtenances, improvements, and attachments thereon, is more fully described as:

> The Southwest Quarter (SW ¼) of the Southeast Quarter (SE ¼) and the East half (E ½) of the Southwest Quarter (SW ¼) of section 4, township 40 North, Range 24 West of the 5th P.M., in Henry County, Missouri, except that land conveyed to the

United States of America recorded in Book 498, Page 275 in the Office of Recorder of Deeds and except roads and subject to all easements, restrictions, encumbrances and other matters of record.

Except a tract of land being located in the Southwest Quarter (SW ¼) of the Southeast Quarter (SE ¼) of section 4, township 40 North, Range 24 West of the 5th P.M., in Henry County, Missouri, being described as follows:

Beginning at the Northeast corner of said Southwest Quarter (SW ¼) Southeast Quarter (SE ¼); thence S. 01 degree 08' 13" W. along the East line of said Southwest Quarter (SW ¼), Southeast Quarter (SE ¼), a distance of 848.00 feet to the centerline of county road SE 971 Road; Thence Northerly along said centerline the following 5 calls: N. 42 degrees 26' 49" W. 346.37 feet to a point of curvature to the right; said curve having a radius of 2638.46 feet, an arc distance of 225.60 feet, a chord bearing N 34 degrees 46' 04" E, 225.53 feet; N 38 degrees 58' 36" E, 108.94 feet to the North line of said Southwest Quarter (SW ¼), Southeast Quarter (SE ¼); thence S. 89 degrees 22'52" E Along the North line, a distance of 33.64 feet returning to the point of beginning.

3.      The record owner of the defendant real property is Ariana Reed.

Others who may have interest in the defendant property are Cameron Hager, The A6J Estate Trust, Tracy Weaver, Trustee, and Gary Reed and Barbara Reed, as lienholders.   The United States does not request authority from the Court to seize the defendant real property at this time. The United States will, as provided by 18 U.S.C. §§ 985(b)(1) and (c)(1):

  a.  post notice of this action and a copy of the Complaint on the defendant real property, and

  b.  serve notice of this action on the defendant real property owners, and any other person or entity who may claim an interest in the defendant real property, along with a copy of this Complaint, and

2

c. file a Lis Pendens against the defendant real property.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a). This Court also has jurisdiction over this particular action under 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C).

4. This Court has *in rem* jurisdiction over the defendant property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in the Western District of Missouri.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in the Western District of Missouri.

## BASIS FOR FORFEITURE

6. The defendant real property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or an attempted transaction in violation of sections 1956, 1957 and 1960 of Title 18, United States Code, or is property traceable to such property.

7. The defendant real property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes property derived from proceeds traceable to an offense constituting a "specified unlawful activity" as defined in Section 1956(c)(7) of Title 18, United States Code, or conspiracy to commit such offense, with such offenses including violations of Title 18, United States Code, Section 1343 (wire fraud).

3

## FACTS

8.      On September 28, 2017, FBI Kansas City office received a complaint about an investment scheme involving the purported purchase and sale of cattle herds by Cameron J. Hager (Hager), 585 SE 971st Road, Clinton, Missouri doing business as Parsh Holdings and 5A Holdings, LLC in the Western District of Missouri.

9.      Hager is married to Ariana Reed (Reed), the record owner of the defendant property which is the subject of the above-captioned civil complaint. Hager's last known address was at the defendant property.

10.      Investigation revealed that during the time from approximately July 2015 through September 2017, Hager received approximately $4.7 million dollars from approximately 89 investors in three bank accounts Hager controlled at Equity Bank, Clinton, Missouri, including his personal account and accounts in the name of 5A Holdings LLC and Cuzi Unlimited. Investors intended these funds be used to purchase and sell cattle herds as investments.   Investment amounts ranged from $1,000 to $267,000. Analysis of Hager's three bank accounts determined that no cattle or cattle herds were purchased with investors' funds.   Instead, Hager used investors' funds to pay commissions, referral fees to certain investors for bringing in additional investors and pay "returns" of approximately $1.2 million dollars. Before the scheme unraveled, Hager used the majority of investor funds for his personal living expenses, including paying his home mortgage, travel expenses, lodging, airfare, payments for religious conferences, numerous Amazon purchases, ATM withdrawals, building supplies, payments on Barclay, Chase, and Capital One credit cards, paying taxes and purchasing

4

personal vehicles. As a result of Hager's misuse of investors' funds, the loss is currently estimated at $3.5 million dollars.

11.     As part of this investigation, 17 investors have been interviewed to date. The investors typically received information about the cattle fund by email, telephone, or in person by Hager, T.M., or another investor. T.M., from Newport News, Virginia, was recruited by Hager in March 2016 at a men's religious conference to identify and solicit investors. T.M. recruited investors for Hager while Hager controlled all the money and bank accounts.

12.     Hager paid T.M. commissions and paid "returns" to certain investors. T.M.'s commission was to be 10% after $100,000 and 12% for anything over $100,000. The commissions motivated T.M. to solicit investments from his wife, parents, in-laws, best-man, friends, business associates, pastors, and members of the U.S. military. Hager's 5A Holdings' payment of "investment returns" motivated at least six other cattle fund investors to solicit their friends and family members to invest in the cattle fund. Hager told T.M. the cattle fund had a certain amount of funds available for commission payments. T.M. was led to believe his commission payments never came from investor funds. This was not true. Analysis of Hager's accounts reveal that all commission/referral payments came directly from investors' funds.

13.     Hager's investor solicitation included traveling to T.R. and T.T.R.'s home in Newport News, Virginia where he gave a presentation to T.R. and T.T.R.'s friends and family about the cattle fund. T.R. and T.T.R.'s are T.M.'s in-laws.

5

14.     On November 29, 2016, a $125,000 wire transfer was made from cattle fund investors T.R. and T.T.R.'s account at The Kingdom Trust to Hager's 5A Holding account at Equity Bank.   This $125,000 was intended to be used for a cattle fund investment.

15.     Every investor interviewed described the cattle fund in virtually the same way, as it was described to them by Hager, T.M., another investor, or through documents provided to them.

16.     The scheme was generally described as follows:   Hager was pooling investor funds to buy cattle herds.   The cattle fund would assist cattle farmers who wanted to get out of farming or assist distressed cattle farmers in Missouri, Nebraska, Colorado, and Texas, and elsewhere who could not feed their cattle.   The cattle fund offered almost instant liquidity for farmers looking to sell their herds.   The cattle fund had its own transportation and pastures.   The fund bought herds from cattle farmers, transported the herd to fund-owned or fund-leased land, fattened up the herd, and sold the herd through Hager's contacts at beef packing plants for a profit.   Hager had connections with the two largest slaughterhouses in the country.   The fund used a patented feeding mechanism and algorithms to fatten up the cows.   The investment cycle was five to six months with a return on investment of 20-28%.   Each herd was segmented as a separate investment.   An investor bought a herd or part of a herd.   The cattle fund had a vet that checked every herd before they were purchased.   The investors received their return first, and the fund expenses were taken out at the end.   The fund expenses included Hager's costs, fees for Hager's business partner, Monte F., vet fees, transportation, feed and water.

6

17.     Investors were typically provided documentation for their investments via email from Hager or through T.M.   The documents included wire transfer instructions for the 5A Holdings' account at Equity Bank, a Frequently Asked Questions (FAQ) summary of the cattle fund, a statement showing their 5A Holdings' investments, a 5A Holdings' letter describing the fund, a net return graph, copies of redacted insurance policies purported to be used for the cattle herds, and a Cattle Share Agreement or Cattle Collaboration Agreement.   The investors would typically be sent emails by Hager listing the herds they could choose to invest in.   For each herd, the information provided in the emails often included something similar to the following:

> "Beginning 9/11/17 we will be traveling to Alpine, TX to begin livestock acquisition CA#TX2999.   The total amount being raised is $237,000. The expected return is 25-26% for the participant.   Important dates: 9/8/17 – Final funding insertion deadline. 2/7/18 – Anticipated final payout."

18.     After their initial investment, some investors were provided statements listing the status of their investment, including the number of herds purchased and whether the investor had rolled over their return or cashed out.

19.     At the initiation of their investments, the investors would be provided a "Cattle Collaboration Agreement" or "Cattle Share Agreement." This document appeared similar to a contract.   The agreements were signed by the investor and Hager.   The agreements identified the investor as "Partner," 5A Holdings as "Manager," the amount invested as "Contribution," and listed an identifying number for the cattle herd purchased.

7

20.     As part of his investment solicitation, Hager provided several 5A Holdings' cattle fund investors copies of a document purported to be a Westfield Insurance policy on company letterhead for a policy in the name of "5A Holdings, c/o Cameron Hager."   The purported insurance policy included account and policy numbers and listed property and livestock covered by the policy.   This document was part of Hager's claim that the cattle fund carried insurance on the cattle herds it was purchasing and selling.

21.     A representative at Westfield Insurance, Westfield Center, Ohio, advised they had no records for Hager, 5A Holdings, or of the account or policy numbers shown on Hager's insurance documents.

22.     Hager provided other investors a 19 page insurance document purportedly issued by XLC Underwriters.   The insurance document did not contain a cover page or any information to identify the insured party or assets insured.   A Special Agent for the National Insurance Crime Bureau (NICB) was unable to confirm XLC Underwriters existed.   The NICB Agent checked with other NICB member insurance company representatives who indicated they had never heard of XLC Underwriters.   A Google search for "XLC Underwriters" was negative.

Cameron Hager's Statements

23.     On or about November 3, 2017, Hager provided documents to the Missouri Secretary of State, Securities Division, related to their investigation of Hager's cattle herd investment activities with 5A Holdings. Contained within those documents was a one-page narrative, file date

October 30, 2017, which appeared to be written by Hager and directed to the Securities Division investigator.   Hager stated the following in the narrative:

> "[T]here never were any cattle purchases.   I used the money to pay returns, personal bills, and purchases and to invest into other opportunities hoping to catch up so I could pay people back and shut down the opportunity.   I was wrong and deceived people and I am deeply regretful for what I did."

24.     On November 7, 2017, investors previously interviewed during this investigation began to re-contact the FBI to advise that Hager had begun to send them checks with "restitution" written on the memo line of the check. The checks amounted to approximately 10% of their outstanding investment with 5A Holdings.   Two of the investors, T.D., Yorktown, Virginia and M.P., Acworth, Georgia, provided copies of the checks they received from Hager and the letters that accompanied the checks.   Both checks were drawn on Hager's 5A Holdings account at Equity Bank, Clinton, Missouri, and "restitution" was written on the memo line.   Both letters were dated October 31, 2017, and appeared to be identical.   The letters were not signed, but contained Hager's typed name at the bottom and contained the following statements:

> "First I want to tell you I am extremely regretful for what has happened.   I know many famiilies are affected by this and lives and plans are now changed.   I am terribly sorry to have caused any pain. Second I confess to not always being truthful about the fund and I am ashamed for lying to you."

T.M.interview

25.     The initial complaint regarding this investigation came from T.M., Newport News, Virginia.   T.M. met Hager in March 2016 at a spiritual conference in Georgia.   During the conference, Hager and T.M. discussed

9

Hager's cattle fund investment. Hager told T.M. the cattle fund had been well-established by Monte F., the founder and owner, and returns were very profitable. Hager told T.M. the cattle investment business was started by Monte F. approximately 13 years ago; however, Hager came into the company and began to run the business with Monte F. stepping into the background. Hager offered T.M. a job with the cattle fund to recruit investors. T.M. accepted Hager's offer and began working for Hager in or about April 2016. T.M.'s job title was Capital Development Manager. Neither Hager nor T.M. held any securities licenses.

26. Hager told T.M. he wanted the cattle investment to stay off the internet and out of the public eye because, according to Hager, the cattle fund was unregulated. Hager said he was afraid someone might steal the idea. Hager stated the SEC took the fun out of the party.

27. Hager initially conducted business as Parsh Holdings, but then changed the name to 5A Holdings, LLC. After T.M. recruited investors, he sent them documents via email to complete the agreement. T.M. generally received these documents from Hager via email before sending the documents to the investor. Investors' money was sent to bank accounts controlled by Hager at Equity Bank based on directions provided by Hager. Ninety-five percent of the documents provided to investors were completed by Hager, the rest by T.M. Sometimes T.M. completed the documents because Hager was too slow.

28. Hager used an e-signature to sign some of the "Cattle Collaboration Agreements" or "Cattle Share Agreements." Initially, Hager created all the documents himself, entering the specific information for the

investors and the cattle herd purchased.   Hager would create a PDF file of the agreement and send it to the investor for their signature.   The process changed on an unknown date when Hager sent T.M. an email authorizing him to use Hager's e-signature for these documents.   T.M. did not use the e-signature for everyone.   Generally, the process was the following: T.M. sent a copy of the cattle collaboration agreement to Hager to get his "OK" before sending it to the investor.   When T.M. sent the document to the investor, he always copied Hager in the email. Through this process, Hager was fully aware of who was investing and the amounts of money being invested.

29.   Every time a new herd was purchased by the fund, Hager sent T.M. an email containing a short description of the herd, which included where the herd was located, and the dollar amount of the insurance for the herd.

30.   T.M. communicated via email with Hager and investors from wherever he was located in the United States.   Email addresses used by Hager were the following:   Cameron_hager@yahoo.com and Cameron.hager@5aholdings.com.   T.M. was the main point of contact for the investors, although he did some investor introductions to Hager through three-way phone calls, after which Hager would deal directly with the investors.   Some of the investors went around T.M. and dealt directly with Hager.   Some of the bigger investors worked directly with Hager.   Hager prided himself on being accessible to investors and would give out his cellphone number.

31.   Hager would not let T.M. see the cattle herds despite T.M.'s repeated requests.   By April 2017, according to Hager, T.M. had proven

11

himself enough for Hager to show him the cattle herds. Hager arranged for T.M. and T.M.'s uncle, S.B., also an investor, to meet with Hager's traveling veterinarian, Dr. H., in Missouri to take them around and show them the herds. Hager was unable to meet them because he purportedly had to be out of town at the last minute. T.M. and S.B. flew to Kansas City and met Dr. H. south of Kansas City. Over the next 12 hours, T.M. and S.B. followed Dr. H. as they drove around rural Missouri looking at various cattle herds in fields. Some of the cows had ear tags with random numbers on them. T.M. advised there was no way to identify which cows belonged to the cattle fund, and which cows belonged to someone else.

32.     On an unknown date, T.M. urged Hager to hire an administrative assistant. Hager eventually claimed he hired Leslie S. to handle administrative matters. T.M. emailed with Leslie S. several times over the course of employment at [Leslie.S]79@gmail.com; however, T.M. is not sure Leslie S. existed. After she was allegedly hired by Hager, the administrative side of 5A Holdings got worse. T.M. never met or talked with Leslie S.

33.     Hager told T.M. he was a former police officer and DEA agent. Because of his experience as a DEA agent, Hager claimed he was good at reading people.

34.     Hager was a police officer with Overland Park, Kansas Police Department from August 1997 to March 2003; however, Hager was never associated with the DEA.

35.     On or about September 19, 2017, Hager's wife, Reed, gained access to Hager's cellphone and laptop computer. T.M. had been attempting

12

to contact Hager, but Reed answered Hager's phone. T.M. asked Reed about Monte F. T.M. had always asked Hager about Monte F., but Hager would never allow T.M. to speak with him or meet him. According to Hager, T.M. had to work up to meeting Monte F. Eventually, Hager said he would put T.M. in contact with Monte F., but only by email. On an unknown date, T.M. received an email purportedly from Monte F. During T.M.'s telephone conversation with Reed, she accessed Hager's laptop and found two emails which appeared to contain Monte F.'s name, [Monte F.]@gmail.com. The first was an email which appeared to have been created by Hager as a test email sent to an email address in Monte F.'s name. The second email was an email prepared by Hager, made to look like it was coming from Monte F., and sent to T.M. The email T.M. purportedly received from Monte F. was faked by Hager.

36. During T.M.'s phone conversation with Reed on September 19, 2017, Reed checked Hager's cell phone but did not find a contact listing for Monte F. anywhere in Hager's cell phone.

37. That same evening, T.M. spoke with Hager. T.M. asked Hager if the cattle fund was a fraud. Hager responded, saying "Some is, not all." Hager told T.M. his plan was to repent and restore the investors by repaying everything. Hager claimed he had an attorney and he was going to turn himself in to the FBI. Hager told T.M. he intended to repay the investors by November 1, 2017.

38. Hager has a home office at his residence, 585 SE 971st Road, Clinton, Missouri. Since T.M. began working for Hager in April 2016, T.M. has met Hager in person two to three times. T.M. has never been to Hager's

home.   Only T.M.'s father-in-law, T.R., an investor, has been to the home. On or around January 2017, T.R. was invited to Hager's house.   T.R. was not permitted inside.   Instead, T.R. and Hager met outside.

39.   T.M. provided the FBI with three Excel spreadsheets listing cattle fund investors, which displayed their names, amounts invested, dates of investment, and notes indicating if the investments were rolled over or paid out.   This list covered the time frame March 29, 2016, to June 5, 2017. These spreadsheets were provided to T.M. by Hager.   All the numbers on these spreadsheets were Hager's numbers and consisted of Hager's accounting for 5A Holdings.   T.M. called Hager "the keeper of the list."   On September 6, 2016, Hager sent T.M. an email with the subject line "wires to and fro" which listed outgoing and incoming wire transfers for 5A Holdings from March 29, 2016, through September 5, 2017.   Hager kept track of all the money for 5A Holdings.   After Hager purportedly hired Leslie S. to handle the administrative side of 5A Holdings, Hager stopped providing T.M. updates regarding investments.

40.   Following Hager's admission to T.M. about the cattle fund in their telephone conversation on September 19, 2017, Hager sent emails to all investors on October 5, 2017, advising them the cattle fund was closed down as of September 30, 2017.   Hager stated the following in his email:

> "Since March of 2016 insertions [sic] were being placed to produce returns but unfortunately were not yielding enough to continue on in 2017.   Therefore the unintended consequences of many decisions made, have resulted in a loss. Currently we are going through all inputs and determining a partially restitution plan for all participants. The first distribution will occur on or before October 31, 2017."

Business filings and Monte F.

14

41.     Missouri Secretary of State business filings showed Parsh Holdings was formed July 17, 2015, as a fictitious business entity, naming Hager and Monte F. as forming members.   An address in Overland Park, Kansas was listed for Monte F.   The business address for Parsh Holdings and Hager was 585 SE 971st Road, Clinton, Missouri, which is Hager's residence.     Hager's email on the formation document was Cameron_hager@yahoo.com.   The formation document was filed electronically.   Investigation of Monte F.'s Overland Park, Kansas address determined it to be a UPS store.

42.     Missouri Secretary of State business filings showed 5A Holdings, LLC, was formed on February 8, 2006, by Hager at 585 SE 971st Road, Clinton, Missouri.   The initial filing document appeared to contain Hager's signature.   On January 16, 2007, the registered agent was changed from Hager to T.C., with an address in Kansas City, Missouri.   5A Holdings, LLC, is currently active.

43.     Further searches for Monte F. in Missouri, Kansas, and nationwide were negative.

44.     During a consensually recorded meeting on October 2, 2017, (detailed below), between Hager, T.M., and his father D.M., Hager admitted Monte F. was not real.

Dr. H., veterinarian

45.     Dr. H. was purported to be the vet used by Hager's 5A Holdings. As previously described, T.M. and S.B. met Dr. H. in April 2017 in Kansas City, Missouri, where they drove around looking at herds of cattle.   This

15

investigation has determined that Dr. H. is likely not a veterinarian and the individual T.M. and S.B. met in April 2017 was likely using an alias.

46.     Review of American Association of Veterinary State Boards to identify links to Kansas and Missouri veterinary boards for licensee searches. Searches were conducted for Dr. H.'s name at the websites for the Missouri Division of Professional Regulation and Kansas Board of Veterinary Examiners.   No record was found for Dr. H.   Google searches for a veterinarian in Kansas or Missouri named Dr. H. were negative.

47.     Toll and subscribe records were obtained for Dr. H.'s cellular telephone number, 417-xxx-x621.   The phone was a Verizon Wireless number, resold to TracFone.   No subscriber information for Dr. H. was identified.   Toll records revealed two contacts, during March 2016 to October 2017, between telephone numbers tied to Hager, cell phone number 816-377-1319, and Dr. H.'s cell phone.   The first was on April 19, 2017, when T.M. and S.B. met with Dr. H.   The second was on September 19, 2017, consisting of two telephone calls between Hager and Dr. H.   This was the day after the cattle fund began to collapse.

48.     On November 2, 2017, investor S.B. attempted to call Dr. H.'s telephone number; however, the phone was disconnected.

Missouri Secretary of State, Securities Division

49.     At or about the same date the FBI opened its investigation of Hager dba 5A Holdings, the Missouri Secretary of State, Securities Division opened a separate investigation pursuant to complaints filed by T.M., S.B., and other investors.   The Securities Division sent a request to Hager doing business as 5A Holdings requesting certain documents relating to 5A

16

Holdings. On or about October 31, 2017, Hager mailed a computer jump drive to the Securities Division. A copy of the contents of this jump drive were subsequently provided to the FBI on November 3, 2017. The jump drive contained 483 files and file folders, including a one page narrative, file date October 30, 2017. This document appeared to be written by Hager. The document began by explaining the following:

> "I created an opportunity for acquaintances, friends, and others to be involved in cattle herd purchases that would provide a high return over 4-6 months. It was sold to be consistent and covered by catastrophic insurance, but still an investment, but more of a crown funding opportunity to be a group of guys coming together to chip in money to buy cattle."

50.    Hager explained how he had several individuals, "referrers," including T.M., to refer family and friends. T.M. had several people under him who he would pay a 5% referral fee.

Hager continued:

> "[T.M.] or other referrers would introduce me to their people on the phone or handle them themselves and propose the deal to them and if they chose to participate they would wire the money to the 5A Holdings account at Equity Bank here in Clinton, Missouri."

51.    The investors received a cattle collaboration agreement and a statement indicating where their money was. Some people never got the agreements. Some investors did not sign the agreements but returned the agreements to Hager. According to Hager, the cattle fund operated from March 2016 through September 2017.

52.    This document also contained Hager's admission that there was no cattle fund.

Recorded conversations with Hager

17

53. Z.F., Williamsburg, Virginia, was an investor in the cattle fund. Z.F. lost approximately $37,250 through his cattle fund investment. On September 27, 2017, after investors learned of Hager's statements to T.M. about part of the cattle fund being fraud, Z.F. recorded a telephone conversation with Hager. Hager made the following statements as he attempted to explain what had gone wrong with the cattle fund:

Hager made some bad decisions. He continued to claim there were cattle purchased; however, he had monies going into other areas that he thought would perform well. Hager admitted he had been deceitful about some of the things he told the investors. Hager's plan now is to begin a restitution process. He couldn't keep going on with this deceit. His responsibility was restitution. He wanted to be able to look people in the eye and say there were a few things he did wrong, and some things about which he was deceitful. There were some things about which he didn't tell investors the truth. Hager knows people trusted him and he broke that trust. When asked by Z.F. if Monte F. existed, Hager advised he did early on, but Monte F. has been out for a while. It really wasn't the same "Monte" that Hager was portraying. At the very beginning, Monte F. helped Hager set up, but "the Monte" he was portraying did not exist. Hager advised "the Monte" story was a bad story. Hager is sorry he did that. Hager got sucked into it almost like he believed it. Hager is sorry he lied to Z.F. about that. It is Hager's full responsibility and no one else's. He wants to take the full blame.

54. On October 2, 2017, T.M. and his father D.M. participated in an FBI monitored consensually recorded meeting with Hager at Harrisonville, Missouri during which Hager made the following statements:

Hager was going to begin sending out restitution. He still had some of the money. Not everything was a lie. There were cattle, but Monte F. was not real. Hager had worked with a man named Monte before [T.M.] got involved, early on. He created Monte F. because it added extra credibility and added a layer of protection for himself. Most of what he told [T.M.] was accurate. The premise of everything was

18

built on was a lie. Hager knows the process and he will probably go to prison. Hager will face his judgment and it will be just. When asked by T.M. how the fund collapsed if they started doing $700,000 or $1 million a month, Hager stated "there were a lot of bad decisions being made, by a lot of different people. And so, then I played chase. Stock market, you know, gambling, whatever. You know, chase. You just - Oh crap, gotta catch up. Gotta catch up. Bad decision. Bad decision." Hager added "some of that money was going into other investments." When D.M. asked what made Hager feel the need to pay out such a high return, Hager responded "because it was legitimate at first." Hager stated "I look back and see a lot of things that I'm glad I didn't reveal to people. Because that would basically institutionalize you into, into" guilt. Hager told T.M. "if I would have included you, you would have been screwed." Leslie S. was a real person, but she didn't do a good job. Hager stated "I didn't want to bring in some smart person who could figure it out." Hager stated "I think greed is so horrible. Right? Not saying you had it, but I know investors had it…Get rich quick."

<u>Financial Overview</u>

55. This investigation identified three bank accounts used by Hager for the cattle fund. These accounts are the following:

56. Account ending x1202 in the name of 5A Holdings LLC, opened August 28, 2015, at Equity Bank, Clinton, Missouri. Hager was the only signor on the account. The business description was "marketing firm." The address for the account was 585 SE 971st Road, Clinton, Missouri 64735. The ending balance of this account on March 26, 2018, was $10,431.64.

57. Account ending x7828 in the name of Cuzi Unlimited LLC, opened April 6, 2010, at First Community Bank, Clinton, Missouri, which later changed to Equity Bank. Hager was the only signor. The address for the account was 585 SE 971st Road, Clinton, Missouri 64735. Cuzi Unlimited LLC was formed in Washington State on September 4, 2009.

19

Documents provided to the bank listed Hager as the sole member. This account was closed on October 27, 2017.

58. Account ending x9948 in the name of Cameron J. Hager, opened August 22, 2007, at First Community Bank which later changed to Equity Bank. Hager was the only signor on the account. The address for the account was 585 SE 971st Road, Clinton, Missouri 64735. The account was closed on October 27, 2017.

59. No bank accounts were identified for Parsh Holdings. The Parsh Holdings' name was only observed on certain documents provided to investors.

60. Debit cards were issued for each of Hager's three accounts. All cards were in Hager's name.

61. Over the time period of this scheme, the investor funds were Hager's primary source of income. Investor funds received in the Cuzi Unlimited and 5A Holdings accounts were transferred by Hager between these two accounts, and to his personal account at Equity Bank. A summary of account deposit activity follows:

| | 5A Holdings EBx1202 | Cuzi Unlimited EBx7828 | Hager Personal EBx9948 | Totals |
|---|---|---|---|---|
| Investor funds | $4,487,475.75 | $215,880.00 | $2,500.00 | $4,705,855.75 |
| Deposits of Other Funds | $67,282.38 | $130,873.19 | $171,233.94 | $369,389.51 |
| Transfer from 5A Holdings | | $345,739.60 | $514,273.39 | $860,012.99 |
| Transfer | $9,120.50 | | $353,991.90 | $363,112.40 |

| | | | | |
|---|---|---|---|---|
| from Cuzi Unlimited | | | | |
| Transfer from Hager personal | $1,780.00 | $113,225.04 | | $115,005.04 |
| | | | | |
| Total Deposits | $4,565,658.63 | $805,717.83 | $1,041,999.23 | |

## The Defendant Property

### 585 SE 971st Road, Clinton, Missouri 64735

62.    Hager and his spouse, Reed, purchased the residence at 585 SE 971st Road, Clinton, Missouri 64735 (defendant real property) in June 2004. Hager made significant payments on the mortgage using investor funds while he was conducting the 5A Holdings' cattle fund scheme.

63.    On June 8, 2004, a Warranty Deed was filed in Henry County, Missouri, deeding the defendant real property from The Ranch at Truman Lake to Cameron Hager and Ariana Reed.   On June 22, 2004, the home sale closed.   The contract sales price was $525,000 with $420,000 financed through a mortgage with First Magnus Financial.

64.    On March 9, 2009, a Warranty Deed was filed in Henry County, Missouri between Hager, Reed and A6J Estate Trust transferring the defendant real property to A6J Estate Trust. The deed was filed March 9, 2009, but was dated May 20, 2007.

65.    The A6J Estate Trust is dated May 20, 2007, and the Trustee is Tracy Weaver, 7500 College Boulevard, Suite 900, Overland Park, Kansas 66210.   This trust first appeared in the above described warranty deed dated May 20, 2007.

21

66.     On or about March 1, 2016, servicing of the mortgage was transferred from First Magnus Financial to Ditech Financial.   According to a Ditech monthly billing statement dated March 24, 2016, the principal balance of the mortgage loan was $160,668.83.   The total regular monthly payment was $4,964.09; however, total fees, charges, and past due amounts totaled $19,732.64.   This statement noted that "the account was severely delinquent and immediate action was required".

67.     On March 31, 2016, Ditech sent Hager a "Help For America's Homeowners" letter regarding a Home Affordable Modification Program.

## Fraud Proceeds Traced into the Defendant Real Property

68.     Hager used investor funds totaling $104,237.91 to make payments on his home mortgage for the defendant real property.

69.     Using cattle investor funds, Hager made three mortgage payments totaling $19,734.09 from his personal account at Equity Bank. Two payments were made on May 2, 2016 and one payment was made on January 3, 2017.   The financial transactions related to the May 2, 2016 payments on the defendant real property mortgage are as follows:

        a.  On April 19, and 22, 2016, two cattle fund investor wire transfers of $12,000 and $20,000, respectively, were received in the Cuzi Unlimited account at Equity Bank.

        b.  On April 25, 2016, Hager transferred $30,000 from the Cuzi Unlimited account into his personal account at Equity Bank where the money was used to pay his home mortgage.

22

    c.   On May 2, 2016, Hager made two electronic payments of $5,770 and $9,000 from his Cameron J. Hager personal account ending x9948 at Equity Bank to Ditech mortgage. These payments were made using investor funds.

70.    Financial transactions related to the third payment on January 3, 2017, from Hager's personal account and traceable to fraud proceeds are as follows:

    a.   On December 1, 2016, two additional cattle fund investor wire transfers of $60,000 and $50,000 were received in the 5A Holdings account ending x1202 at Equity Bank.

    b.   On December 7, and 12, 2016, transfers of $6,236.37 and $4,500 were made from the 5A Holdings account to Hager's personal account at Equity Bank.

    c.   On December 22, 2016, Hager deposited a check for $8,602 from Farm Bureau Insurance to his personal account at Equity Bank.

    d.   On January 3, 2017, Hager made a third mortgage payment to Ditech of $4,964.09 from his personal account at Equity Bank.

71.    Additionally, using cattle investor funds, Hager made 16 mortgage payments totaling $84,503.82 directly from the 5A Holdings account with payment amounts ranging from $835.61 to $6,783.34. In every instance, a cattle fund investor wire transfer of at least $10,000 was deposited to the 5A Holdings account in the days prior to each mortgage payment.

23

72.     On September 1, 2017, servicing of this mortgage was transferred to Bay View Loan, Coral Gables, Florida.   The outstanding principal was $86,261.74, with a past due amount of $10,991.01.

73.     On September 21, 2017, after the cattle fund began to collapse, a Trustee's Deed was filed between Tracy Weaver, trustee of The A6J Estate Trust, and Reed conveying the property to Reed.

74.     At the time of the above warranty deed transfer from The A6J Estate Trust to Reed, the residence had a second mortgage held by Equity Bank.   Hager and Reed initially obtained the second mortgage for $125,773 from First Community Bank (later Equity Bank) on November 12, 2004.   By October 2, 2017, the balance of the second mortgage, still in Hager's and Reed's names, was $45,974.30.

Loan from G.R. and B.R. on the Defendant Real Property<br>to Pay Off First and Second Mortgages

75.     On October 2, 2017, a Deed of Trust was filed between Reed and G.R. using the defendant real property as collateral for a loan in the amount of $139,790.14.   G. R. is Reed's father who lives across the street from the defendant real property.   Reed used this loan from her father to pay off the Bay view mortgage (first mortgage) of $93,047.89 and Equity Bank mortgage (second mortgage) of $45,974.30 on the defendant real property as follows:

      a.   On October 2, 2017, the Bay View Loan mortgage was paid off by wire transfer from Equity Bank.   Bay View Loans' records show the wire transfer came from B.R. and G.R. at Equity Bank.

b. On September 14, 2017, the principal balance of the Equity Bank second mortgage was $45,974.30. On October 2, 2017, this balance was paid off by G.R. according to Equity Bank.

76. The 2017 Henry County Tax Statement for the defendant real property listed Reed as the property owner. The land area is listed as 46.6 acres.

77. Since an unknown date, and after the cattle fund collapsed, the house has been listed for sale with Mossy Oak Properties of the Heartland, Blue Springs, Missouri. The asking price is $899,000.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

78. The Plaintiff repeats and incorporates by reference the paragraphs above.

79. By the foregoing and other acts, defendant real property located at 585 SE 971st Road, Clinton, Missouri 64735 was involved in transactions or attempted transactions in violation of Title 18 Sections 1956, 1957, and 1960, or is property traceable to such a transaction, and therefore, is forfeitable pursuant to 18 U.S.C. § 981(a)(1)(A).

### SECOND CLAIM FOR RELIEF

80. The Plaintiff repeats and incorporates by reference the paragraphs above.

81. By the foregoing and other acts, defendant real property located at 585 SE 971st Road, Clinton, Missouri 64735 constitutes or was derived

25

from proceeds traceable to violations of 18 U.S.C. § 1343, that is wire fraud, and therefore, is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE the United States prays that the defendant real property be forfeited to the United States, that the plaintiff be awarded its costs and disbursements in this action, and for such other and further relief as the Court deems proper and just.

Respectfully submitted,

Timothy A. Garrison
United States Attorney

By:      _/s/ Stacey Perkins Rock_
             Stacey Perkins Rock, #66141
Assistant United States Attorney
400 E. 9th Street, Fifth Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122
E-mail: stacey.perkins-rock@usdoj.gov

## VERIFICATION

I, Special Agent Thomas A. Jackson, hereby verify and declare under penalty of perjury that I am a Special Agent with the United States Federal bureau of Investigation, that I have read the foregoing Verified Complaint *in Rem* and know the contents thereof, and that the factual matters contained in paragraphs eight through 77 of the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of the Federal Bureau of Investigation.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.


Dated    3/28/17                              */s/ Thomas A. Jackson*
                                             Thomas A. Jackson
                                             Special Agent
                                             Federal Bureau of Investigation

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI

## CIVIL COVER SHEET

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the Western District of Missouri.

**The completed cover sheet must be saved as a pdf document and filed as an attachment to the Complaint or Notice of Removal.**

**Plaintiff(s):**

First Listed Plaintiff:
United States of America ;
**County of Residence:** Jackson County

**Defendant(s):**

First Listed Defendant:
585 SE 971st Road, Clinton, Missouri 64735 ;
**County of Residence:** Henry County

**County Where Claim For Relief Arose:** Henry County

**Plaintiff's Attorney(s):**

Assistant United States Attorney Stacey Perkins Rock ( United States of America)
United States Attorney's Office
400 E. 9th Street, Fifth Floor
Kansas City, Missouri 64106
**Phone:** 816-426-7173
**Fax:**
**Email:** stacey.perkins-rock@usdoj.gov

**Defendant's Attorney(s):**

**Basis of Jurisdiction:** 1. U.S. Government Plaintiff

**Citizenship of Principal Parties** (Diversity Cases Only)

    **Plaintiff:** N/A

    **Defendant:** N/A

**Origin:** 1. Original Proceeding

**Nature of Suit:** 690 All Other Forfeiture and Penalty Actions

**Cause of Action:** The defendant real property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or an attempted transaction in violation of sections 1956, 1957 and 1960 of Title 18, United States Code, or is property traceable to such property. The defendant real property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes property derived from proceeds

traceable to an offense constituting a "specified unlawful activity" as defined in Section 1956(c)(7) of Title 18, United States Code, or conspiracy to commit such offense, with such offenses including violations of Title 18, United States Code, Section 1343 (wire fraud).

**Requested in Complaint**

**Class Action:**  Not filed as a Class Action

**Monetary Demand (in Thousands):**

**Jury Demand:**  No

**Related Cases:**  Is NOT a refiling of a previously dismissed action

---

**Signature:** Stacey Perkins Rock

**Date:**  3/28/18

If any of this information is incorrect, please close this window and go back to the Civil Cover Sheet Input form to make the correction and generate the updated JS44. Once corrected, print this form, sign and date it, and submit it with your new civil action.